IN THE UNITED STATES DISTRICT COURT
FOR NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: SAMSUNG CELLULAR DEVICE ASSOCIATED WITH AUSTIN MUCK. | Case No. 3:24-mj-757<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, David R. Todd being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant is an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Your Affiant is a Task Force Officer with the Department of Justice United States Drug Enforcement Administration and has been so since July 2023. Your Affiant is currently assigned to the Fargo Resident Office and charged with investigating drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code. Your Affiant has been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.

2.      Your Affiant is presently employed by the West Fargo Police Department and have been so employed since January 2017. Your Affiant was transferred to the Cass County Drug Task Force in February 2023 as a narcotics detective, and most recently deputized through the DEA in July 2023. Throughout Your Affiants time as a law enforcement officer Your Affiant has attended multiple courses with topics to include but are not limited to investigative techniques, identification of controlled substances, methods of importation, transportation, manufacture, distribution and concealment that are and have been utilized by controlled substance violators.

3.      In addition to Your Affiant's training discussed above, during Your Affiant's time as a narcotics detective, Your Affiant has participated in several controlled substance investigations which have resulted in the arrest of major violators of controlled substance laws and the seizure of illicit drugs and drug-related evidence. Your Affiant has also participated in and/or executed search and seizure warrants authorizing the search of locations utilized by drug traffickers and their co-conspirators and vehicles used to transport controlled substances.

4.      Your Affiant is familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers distribute drugs, and the ways that drug traffickers use cellular telephones to facilitate their activities. Your Affiant has been trained in data extraction of cellular phones for future analysis.

5.      The facts set forth in this affidavit are known to Your Affiant as a result of his personal participation in this investigation and through conversations with other investigators with the DEA and other law enforcement officers, as well as reviewing reports and documents prepared by investigators investigating this matter. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

## PURPOSE OF THE AFFIDAVIT

1.      Your Affiant submits this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seize data and records from cellular communication device, specifically described as:

   a. **DEVICE #1** – A blue Samsung phone belonging to Austin Muck. The above-described cellular phone will be referred to as DEVICE #1 hereinafter.

This Target Device is currently in custody at the West Fargo Police Department, West Fargo, North Dakota.

2.      Through Your Affiant's training and experience, Your Affiant is aware that individuals who deal in illegal controlled substances commonly use cellular telephones to maintain addresses; telephone numbers; bank account information, including deposit amounts, names and numbers; drug and money ledgers; directions and instructions; travel, time, and route navigation information; and other information specific to drug dealing. In addition to continuing their illegal businesses, these individuals often utilize cellular phones to maintain contact with their criminal associates; to access the internet; to transact banking and other financial business over the internet; and to keep records of these transactions on the computer memories. Oftentimes, travel, transportation, and transaction instructions are sent and received via text message, e-mail, or instant messages which are stored on the digital memories of these devices. Internet e-mail providers require little or no personal information to activate e-mail accounts used to give directions and to report progress in furtherance of the illegal drug trade. These e-mail messages are stored on the memories of the cellular telephones. Memory in cellular telephones includes internal memory, and memory storage on removable devices such as SIM cards and SD cards. In addition, some devices have built in electronic digital cameras and digital video capabilities. Individuals who deal in illegal controlled substances often take, or cause to be taken, photographs of themselves their associates their properties and their illegal products and merchandise. Lastly, Your Affiant knows that cellular telephones can store information for long periods of time, and even if records are deleted, many times, through the use of forensic tools, the records may be retrieved.

3.      Searching for the evidence described may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information; encode communications to avoid using key-words; attempt to delete information to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require law enforcement officers or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in the Attachments, or perusing all stored information briefly to

determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA intends to use whatever data analysis techniques necessary to locate and retrieve the evidence sought.

## TECHNICAL TERMS

4. Based on Your Affiant's training and experience, Your Affiant uses the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data,

  including data unrelated to photographs or videos.

 c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

 d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

 e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Digital display device: A digital display device is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network or internet network. Some devices enable the user to send, as well as receive, text messages.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or other such device attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers or other such device have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

5.      Based on my training, experience, and research, I know that the device described in this affidavit commonly has capabilities that allow it to serve various functions, including, but not limited to, a wireless telephone; a digital camera; a portable media player; a GPS navigation device; a digital display device, and a PDA with an internet connection. In my training and experience, examining data stored on cellular telephones of this type can uncover, among other things, evidence which reveals or suggests the identity of the person or persons who possessed or used the device as well as information regarding criminal activities and criminal conspirators.

## FACTS AND OPINIONS

1.      In October 2024, the Cass County Drug Task Force (CCDTF), the United States Postal Inspection Service (USPIS), and the Drug Enforcement Administration (DEA) received information that Austin Muck (DOB: 04/06/1993) was distributing large amounts of Methamphetamine within North Dakota. Information was also obtained from Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) SA Christy Gass that Muck may be trading methamphetamine for firearms.

2.      In September 2024, TFO Jacob Zach with the CCDTF received information from a confidential source (CS) regarding drug distribution within North Dakota being facilitated by Muck. The CS stated that Austin Muck sells fentanyl laced M30 pills and has witnessed Muck with over one hundred pills at a time. The CS stated that they have contacted Muck about narcotics through cellular phone utilizing phone number 701-730-4821.

3.      On November 5th, 2024, TFO Zach applied for and was granted a search warrant (Warrant Number 2024-03327) by the Honorable Cass County District Court Judge Stephanie Hayden for the residence of 1932 Times Square Way, West Fargo, North Dakota 58078. On November 5th, 2024, the CCDTF and DEA conducted a search warrant at 1932 Times Square Way, West Fargo, North Dakota 58078. Found within the residence were multiple items of fentanyl and methamphetamine paraphernalia. A cellular phone belonging to Alexandra Hewitt (DOB: 06/03/1992) was also seized. Pursuant to the warrant, TFO Zach was authorized to search the contents within Hewitt's cellular phone.

4.  TFO Zach Witnessed a significant amount of narcotics related messages within Hewitt's cellular phone. Within Hewitt's Facebook Messenger, TFO Zach observed that Hewitt had messaged a Facebook account identified as "Austin Muck" (Facebook Profile ID 61555375633909). Within the Facebook conversation Hewitt asks Muck if he would trade "powder" and "up" for cartons of cigarettes. The conversation is as follows:

- Muck: "How much for the marb reds"

- Hewitt: "My buddy took 2 packs of the reds so idk like 40 45 bucks. Unless you have some powder n would wanna trade? I feel like shit so that's my end goal anyways"

- Hewitt: "Idk if you blaze or not but there's like 5 packs of backwoods too"

- Muck: "I don't maybe a few things"

- Hewitt: "Fuck yeah no I need powder"

- Muck: "Got 4 smackers"

- Hewitt: "Shit i thought I messaged you back right away but yeah I dint really do them.things anymore unless they're like all that's around or something so I'd probably just need cash for now"

- Hewitt: "Fuck wait You have up right? I'll take those amd a little bit of that?"

5.  Your Affiant notes that the following slang terms are known to law enforcement: "smackers" is a slang term utilized for fentanyl laced counterfeit M30 pills, "up" is a slang term utilized for methamphetamine, and "powder" is known to be powdered fentanyl.

6.  On November 7, 2024, SA Casey Uhler issued an Administrative Subpoena (IM-25-050694) to obtain toll data and subscriber information from AT&T regarding phone number 701-730-4821. On November 7, 2024, AT&T returned Administrative Subpoena IM-25-050694 and provided the following information regarding 701-730-4821.

- Phone number 701-730-4821 is prepaid phone number subscribed to by Austin Muck (account number 199084675642).

7. Your Affiant notes that cellular devices are often used to obtain access to social media accounts to include Facebook.

8. On November 14, 2024, West Fargo Police Department Officer Jayden Halverson attempted to stop a vehicle bearing the Minnesota license plates ZEF139 (2011 white Dodge Charger) within the city of West Fargo. The vehicle fled from the traffic stop at a high rate of speed and a pursuit was initiated. A Pursuit Intervention Technique (PIT) maneuver was attempted on the vehicle which appeared to deflate multiple tires of the fleeing vehicle.

9. The fleeing vehicle continued in the opposite lane of traffic before losing control and rolling into a ditch in the 2000 block of Sheyenne Street, West Fargo, North Dakota 58078. The vehicle again attempted to flee; however, was blocked in by West Fargo Patrol Vehicles.

10. The driver and sole occupant of the vehicle was Identified as Austin Muck. A search incident to arrest was conducted on Muck which found what appeared to be approximately $4,885.00 U.S. Currency on his person. Found wrapped in the Currency was tin foil containing burnt residue. Through Officers' training and experience they believed that the foil may have been used to ingest fentanyl.

11. West Fargo Police Sergeant Grant Richardson assisted in counting the Currency found on Muck's person. Sergeant Richardson noted in his report:

- "While counting the cash it should be noted that a piece of tin foil with burnt residue was wound up inside the cash. Some of the cash had burnt edges and green leafy substance, appearing to be marijuana shake, fell from the currency as it was being counted."

12. Muck refused medical treatment from first responders while on scene; however, because Muck was involved in a roll-over Officers transported Muck to Essentia Hospital, 3000 32nd Avenue South, Fargo, ND 58103 to be medically assessed before being transported to jail.

13.     Once at the hospital Officers observed a white powdery substance on one of Muck's hands. This substance was collected, and later field tested at the West Fargo Police Department. This white powdery residue tested positive for methamphetamine. The field test was conducted with a Trunarc laser test. During this time Officers also conducted a Driving Under the Influence (DUI) investigation. According to West Fargo Police Officer Robert Mueller's police report, Muck was sweating profusely, had a dilated pupil (Muck self-reported being blind in one eye), and was extremely fidgety. Officer Mueller confronted Muck about being under the influence of a stimulant, to which Muck admitted that he was under the influence.

14.     While at the hospital Sergeant Richardson contacted Your Affiant to inform him of the situation. Your Affiant and DEA Special Agent (SA) Casey Uhler met with Officers and Muck at Essentia Hospital.

15.     Your Affiant and SA Uhler interviewed Muck about the money that was found in his possession. Muck stated he obtained the currency through mowing lawns. Muck stated that periodically throughout the week he has been withdrawing cash from Automated Teller Machines (ATMs) in order to go to the casino. Muck was unable to provide any receipts or bank statements. Your Affiant notes that the currency was in mixed denominations. Through Your Affiant's Training an experience he notes that it is common for drug traffickers to launder currency through casinos to mask the money's origin.

16.     Based on information from multiple different agencies and the circumstances of Muck's arrest, the currency found on Muck's person was administratively seized. The currency was placed into a DEA Self Sealing Evidence Envelope (SSEE) # S001542603. The bag was sealed and placed into temporary evidence storage at Fargo DEA RO.

17.     Muck's cellular phone was seized by the West Fargo Police Department and is currently located within West Fargo Police Department Evidence. Muck's cellular phone is described as a blue Samsung cellular phone (Device #1).

18.     Muck was arrested for Fleeing a Peace Officer within a Vehicle (Second / Subsequent Offense), Reckless Endangerment (Extreme Indifference), Possession of Methamphetamine (Second / Subsequent Offense), and Unlawful Possession of Drug

Paraphernalia (Second / Subsequent Offense). Muck was transported to the Cass County Jail where he was incarcerated for his charges.

19.     On October 14, 2024, Your Affiant and DEA TFO Paul Cichos transported the seized currency (SSEE# S001542603) to Wells Fargo Bank to be counted and converted into a cashier's check written to the United States Marshals Service. SSEE# S001542603 was opened by Wells Fargo Bank staff as witnessed by Your Affiant and TFO Cichos. The seized currency was run through a money counter multiple times which found (2) counterfeit fifty-dollar bills. These bills were surrendered to the bank to be transferred to the United States Secret Service. The total count of currency seized amounted to $4,785.00 U.S. Currency.

20.     While Muck was incarcerated within the Cass County Jail Your Affiant monitored multiple calls made by Muck. Your Affiant notes that parties subject to jail phone calls are informed by automated message that phone calls are subject to law enforcement monitoring.

21.     On November 14, 2024, at approximately 3:57 a.m. Central Standard Time, Muck called phone number 701-306-1687. Utilizing law enforcement resources Your Affiant was able to identify this phone number to belong to Destiny Meyer (DOB 4/27/1997. During the phone call Muck asked Meyer to attempt to remotely access his cellular phone to delete its contents, thus removing potential evidence. Muck provided Meyer his gmail account identified as "muckaustin7@gmail.com." Muck could not specifically remember his password; however, provided Meyer multiple potential passwords.

22.     On November 14, 2024, at approximately 4:23 a.m. Central Standard Time, Muck called phone number 701-306-1687 belonging to Meyer. During this phone call Meyer is actively attempting to access Muck's gmail account to attempt to remotely delete the content of Muck's cellular phone.

23.     On November 14, 2024, at approximately 4:31 p.m. ATF SA Christine Gass and Your Affiant attempted to conduct a Post Miranda interview with Austin Muck at the Cass County Jail. Muck appeared to be evasive during investigators' questioning. Muck stated that he worked as a general contractor; however, did not work for a specific company. When Muck was asked where he currently lived at, he generalized and said, "South Fargo." When pressed on a

more specific address he refused to answer. Muck stated that he does not sell drug; however, admitted to being a daily drug user.

24. Muck stated that he had his identification stolen, so he doesn't use banks and usually keeps cash on him. Your Affiant notes that prior states from Muck, he stated that he had been removing money from ATMs.

25. Muck was asked to identify the individual he obtains drug from, to which muck replied that he was not a "snitch." The interview we thereafter terminated.

26. Your Affiant notes that Muck is currently released on bail.

27. In November 2024, SA Dylan Anthony received information form a Source of Information (SOI) that they have received methamphetamine from Muck. The SOI stated that they were receiving approximately ounce quantities of methamphetamine from Muck. The SOI stated that they had observed Muck driving a white Dodge Charger. Your Affiant notes that Muck was arrested out of a white Dodge Charger by West Fargo Police Department.

28. Muck has a significant narcotics related history to include Possession with Intent to Deliver Methamphetamine (2022), Possession of Drug Paraphernalia (2022), Prohibited Acts with a Controlled Substance (2022), Violation of Probation / Possession of Drug Paraphernalia (2020), Possession of a Controlled Substance Methamphetamine (2020), Unlawful Possession of Drug Paraphernalia (2020), Possession of Drug Paraphernalia (2020), Possession of a Controlled Substance / Methamphetamine (2020). Possession with Intent to Deliver Methamphetamine (2018), Possession of Methamphetamine/ second or subsequent offense (2018), Unlawful possession of drug paraphernalia (2018), Possession of a Controlled Substance / second offense (2017), Possession of Drug Paraphernalia (2015), Possession of a Controlled Substance / Methamphetamine (2014), Possession of Drug Paraphernalia (2014), Possession of a Controlled Substance (2013), Possession of a Controlled Substance (2013), Possession of Drug Paraphernalia (2013), Possession of Drug Paraphernalia (2013), Possession of a Controlled Substance (2012), and Ingesting a Controlled Substance (2012).

29. Based upon Your Affiant's training, education, and experience in conducting narcotics investigations, Your Affiant knows it is common for drug traffickers to obtain and

utilize multiple cellular phones for distributing controlled substances. Your Affiant also knows drug traffickers utilize flip phones as they are inexpensive and disposable, and they can rotate them out and change phone numbers frequently. These phone providers also do not retain subscriber information and they are usually paid for in cash. Your Affiant is also aware that persons who traffic in controlled substances generally keep records, notes, receipts, ledgers, logs of buyers and sellers, transaction amounts, and other similar documentation of their drug trafficking activity. Drug traffickers also utilize cellular phones to engage in drug trafficking, including through text messaging, social media, and phone calls. Your Affiant aware that cellular telephones have various features that save information, data, and images on the cellular telephone that are later accessible to the user. That information includes matters such as calls made, calls received, missed calls, text messages sent and received, contact lists, and photographic and video images. Some of this information can be maintained on media storage devices that may be inserted into the cellular phone. Further, Your Affiant has participated in numerous investigations related to the distribution of fentanyl and other controlled substances wherein cellular phones have been utilized by these drug traffickers. During searches of cellular telephones seized from those individuals, the phones almost always have conversations in text messages and other messaging applications, such as "Facebook Messenger" and "WhatsApp," where users of the phone are arranging drug deals, and communicating with drug purchasers or sources of supply. Your Affiant has also observed numerous photos on such cellular phones where drug traffickers take photos and/or videos of themselves with large amounts of US Currency, of their drug products, and of firearms. Often times, these drug traffickers will send photos of their products to the people purchasing them. They will also often times request those who are laundering drug proceeds to send images of money wire transactions or receipts, or deposit record in financial institutions.

      30.     Your Affiant is aware drug traffickers are known to utilize various methods to conceal drug proceeds and money laundering efforts. This includes, but is not limited to, multiple bank accounts, PayPal, Cash App, or other transactional applications; and the use of crypto currency, to include transaction hash sets, private and public addresses, public and private keys and seed phrases used to recreate cryptocurrency wallets through multiple devices. Your Affiant is aware this data is often stored in mobile devices and requires the utilization of applications by trained investigators to trace transactions, recreate wallets for balance and

transactional data, and utilize the information to potentially identify co-conspirators in drug trafficking and money laundering endeavors.

31. Based on Your Affiant's training and experience, consultation with other law enforcement officers experienced in investigations regarding narcotics trafficking and the forensic examination of computers, computer tablets, cellular telephones and digital media, I have learned the following:

    a. A thorough search of computers, computer tablets, cellular phones and digital media for evidence of instrumentalities of crime commonly requires a qualified expert to conduct the search in a laboratory or another controlled environment.

    b. Searching computers, computer tablets, cellular phones and digital media is a highly technical process which requires specific expertise and specialized equipment. There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with personnel who have specific expertise in the type of computer, computer tablet, cellular phone and digital media that is being searched.

    c. Searching computers, computer tablets, cellular phones and digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential in conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

    d. Therefore, in searching for evidence, fruits, and instrumentalities of criminal activity within cellular telephones or other digital or electronic media, those items will need to be transported to an appropriate law enforcement laboratory for review to determine whether the contents thereof contain evidence and instrumentalities of violations of federal law. These items and the contents

thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence in violation of Title 21, United States Code, Sections 841, 843, and 846, and Title 18, United States Code, Sections 922(g), 924(c), 1956, and 1957.

32. Your Affiant is requesting authorization to search DEVICE #1 and inserted media storage devices for all records, communications, data, and images, in whatever form and by whatever means they have been created or stored on such cellular telephones and storage devices relating to violations of 21 USC § 841(a) (drug trafficking); 21 USC § 843(b) (use of a communications facility); 21 USC § 846 (conspiracy to traffic drugs); 18 USC 922(g) or 924(c) (firearms offenses); and 1956 and 1957 (money laundering), involving Austin Muck and any unknown, or yet to be identified subjects, including lists of drug customers and related identifying information; types, amounts and prices of drugs purchased, used or trafficked, or offered for purchase or sale, as well as dates, places, and amounts of specific transactions; any information related to sources of narcotic drugs (including names, addresses, phone numbers, images, or any other identifying information); photographic or video images of drugs, drug paraphernalia, money or monetary instruments, drug use or drug transactions, and firearms; any information recording the travels of Austin Muck and any unknown, or yet to be identified subjects; and any financial account and transaction information.

33. Based on the above paragraphs, Your Affiant believes that probable cause exists for the issuance of a search warrant allowing Your Affiant access to DEVICE #1 and that DEVICE #1 contains electronic stored data which constitutes evidence of the commission of a criminal offense, or data intended for use which is or has been used as the means of committing a criminal offense.

34. Your Affiant, with assistance from a sworn communication device forensic specialist, therefore requests authorization to search and analyze the aforementioned cellular telephone for data relative to criminal offenses.

35. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 6

months because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

36. Your Affiant further request that the Court seal the warrant and the affidavit and application in support thereof, until May 21, 2025, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the Drug Enforcement Administration, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

The affiant states that the above statements are true and correct to the best of his knowledge, information, and belief.

David R Todd
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 21st day of November 2024.

Alice Senechal
United States Magistrate Judge